UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

JUAN GONZALEZ,

                 Plaintiff,               08 Civ. 3661

   -against-                       OPINION

ROBERT SARRECK, M.D., et al.,

                 Defendants.

----------------------------------------X

A P P E A R A N C E S :

> Pro Se
>
> JUAN GONZALEZ
> #82A-0892
> Mid-Orange Correctional Facility
> 900 Kings Highway
> Warwick, NY  10990
>
> Attorney for Defendants
>
> ANDREW M. CUOMO
> Attorney General for the State of New York
> 120 Broadway, 24th Floor
> New York, NY  10271
> By:  Frederick H. Wen, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10-24-11

**Sweet, D.J.**


Defendants Robert Sarreck, M.D. ("Dr. Sarreck"),
Lester Wright, M.D. ("Dr. Wright"), Marjorie Byrnes ("Byrnes"),
s/h/a Marge C. Byrnes, Karen Bellamy ("Bellamy"), s/h/a
K. Billany, and Thomas G. Eagen ("Eagen") (the "DOCS
Defendants") and the Defendant Thaddeus Wandel, M.D. ("Dr.
Wandel", and collectively with the DOCS Defendants, the
"Defendants") have moved pursuant to Rule 56 of the Federal
Rules of Civil Procedure to dismiss the complaint of the
plaintiff Juan Gonzalez, pro se ("Gonzalez" or the "Plaintiff")
claiming that personnel from the New York State Department of
Correctional Services ("DOCS") violated his constitutional
rights while he was incarcerated at DOCS' Otisville Correctional
Facility ("Otisville") by having not been given an opportunity
for informed consent regarding medical care in violation of the
Fourteenth Amendment and by denial of adequate medical treatment
in violation of the Eighth Amendment. Based upon the facts and
conclusions set forth below, the motions are granted, and the
complaint is dismissed.[1]

---

[1]     On October 4, Gonzalez submitted a Notice of Motion and
Declaration in Support of Cross Motion for Summary Judgment.
Gonzalez' submission, however, appears to be further support in
Opposition to Defendants' summary judgment motions. See
Gonzalez Decl. ¶ 3 ("As such, this plaintiff now moves this
Court for a cross motion seeking summary judgment, allowing this

1

The issues, though relatively straightforward, have been impacted by Gonzalez' pro se status, his subjective conviction that his loss of vision resulted from the actions of the Defendants and his reliance on inmate advice.

**Prior Proceedings**

Gonzalez filed his complaint on April 16, 2008.  In the complaint, Gonzalez alleges that he was diagnosed with chronic angle closure glaucoma by ophthalmologists Dr. Zabin and Dr. McPhorson in 2002 and that Dr. Zabin and Dr. McPhorson referred him to Dr. Wandel, an ophthalmologist, for laser surgery.  Compl. at 3.  Gonzalez further alleges that Defendants were aware that he did "not fluently speak or understand a word of English" and that defendant Dr. Sarreck authorized Dr. Wandel to perform the laser surgery on Plaintiff's right eye.  Id.

The complaint states that the laser surgery was twice performed without Gonzalez' prior informed consent and that he

---

case to proceed to a trial.").  Recognizing that the courts "construe the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments they suggest," Fuller v. Armstrong, 204 Fed. Appx. 987, 988 (2d Cir. 2006), the arguments raised in Gonzalez' October 4 submission are considered herein as further opposition to Defendants' motions for summary judgment.

was refused treatment following the procedures.  Id. at 4, 9.
Gonzalez further alleges that he could not have properly
consented to the procedures on his right eye because he was not
provided access to a Spanish-speaking medical staff interpreter
or an authorized medical employee at Westchester Medical Center
(where the procedure was performed), that he was not informed
about the purpose of the surgery, the surgery's side effects,
other possible treatments, or any possible benefits or
complications resulting from the procedures.  Id. at 9-10.
Gonzalez' complaint states that Defendants "sidestepped" his
concerns about lack of medical treatment and his request for a
different specialist.  Id. at 4-5.  The complaint also alleges
that Defendants were deliberately indifferent toward Gonzalez'
medical well-being and that Defendants did not thoroughly
investigate his grievances, violating both Gonzalez' due process
rights and DOCS' grievance policies.  Id. at 5.  Gonzalez'
complaint claims that the Defendants used delay tactics in
violation of the Eighth Amendment by refusing to treat Plaintiff
unless he consented to laser surgery on his left eye and that
Gonzalez refused left eye surgery because he was afraid that the
surgery would cause him to become blind in both eyes.  Id. at 9-
10.  The complaint also alleges that Gonzalez' refusal made Dr.
Wandel very upset, that Dr. Wandel told Gonzalez that he was

going to become blind anyway, and that Dr. Wandel intentionally delayed treatment for approximately one year. Id. at 10.

Gonzalez has asserted that he has "suffered undesirable pain in his right eye, emotional upsets, and sees a lot worst after the laser surgery was performed," that he now requires the aid of fellow prisoners to escort him when the lights are off and help him read and write, that his glaucoma is developing at a faster rate because his right eye "has not been treated at all" and that Defendants refuse to treat him "unless he submits to left eye laser surgery." Id. at 5. The complaint seeks damages of $2,000,000 and requests declaratory relief in the form of a new glaucoma specialist and for the Court to investigate Defendants so they can "be properly trained." Id. at 26.[2]

Prior to initiating the present action, Gonzalez filed three separate grievances on June 7, 2004, February 1, 2005 and December 28, 2006. Id. at 11, 13, 17. Attached to the complaint are Gonzalez' grievance filings, appeals and responses from both the Inmate Grievance Program Central Office Review

---

[2]     In his papers opposing Defendants' motion for summary judgment, Gonzalez withdrew this request for declaratory relief.

Committee and DOCS.  See id. at E. 3-3, 5-5, 6-6, 7-7, 8-8, 9-9, 10-10, 11-11, 12-12, 14-14, 15-15, 16-16, 17-17.

The first of these grievances concerned Dr. Wandel's unprofessional behavior both in withholding treatment after Gonzalez refused surgery on his left eye and for improperly disclosing Gonzalez' condition in front of a Correctional Officer.  Id. at 11, E. 3-3.  Gonzalez also requested to see a specialist other than Dr. Wandel.  Id. at 11.  In response, Gonzalez was informed that he could not choose a specific health provider unless he paid for the care.  Id. at 11, E. 5-5. Gonzalez appealed the decision, and the Inmate Grievance Program Central Office Review Committee ("CORC") ruled against Gonzalez saying that Gonzalez had been seen by an ophthalmologist, that a follow-up visit was scheduled, that Gonzalez had failed to substantiate his assertion that the previous eye procedures damaged his vision, and that outside agencies (such as Westchester Medical Hospital where Dr. Wandel was employed) were outside the jurisdiction of the grievance procedure.  Id. at 12, E. 7-7.  Gonzalez, however, was informed that he would be able to see a specialist by September 2004.  Id. at 12.  The complaint alleges that, in response to the decision concerning his appeal, Gonzalez wrote to Dr. Wright, Deputy Commissioner

and Chief Medical Officer for DOCS, but that Dr. Wright "sidestepped" the issue and rendered no assistance.  Id. at 13.

In his second grievance, Gonzalez alleged that the condition in his right eye had worsened and that Dr. Sarreck, the Facility Health Services Director of Otisville, refused to abide by CORC's determination that Gonzalez would see a specialist in September 2004.  Id. at 13, E. 10-10.  The Inmate Grievance Program Superintendent denied Gonzalez' grievance, stating that "[t]here is no guarantee that the surgery will be successful the first time or subsequently but it is the best treatment available to grievant."  Id. at 15, E. 11-11. Gonzalez appealed the Superintendent's decision, alleging that DOCS was deliberately indifferent regarding Gonzalez' medical needs.  Id. at 16, E. 12-12.

Gonzalez' third grievance again requested a change of specialist.  Id. at 17, Bauman Decl., Ex. B.  This grievance was denied, Gonzalez' appealed, and CORC responded to the appeal, stating that Gonzalez had not presented sufficient evidence to substantiate any malfeasance.  Compl. at 17, E. 17-17.  Gonzalez has alleged that Defendants did not thoroughly investigate his grievances and violated his due process rights and DOCS' grievance policies and used delaying tactics in violation of the

6

Eighth Amendment by refusing to treat him unless he consented to laser surgery on his left eye.  Id. at 4-5.

After issue was joined, discovery proceeded.  The instant motion for summary judgment was marked fully submitted on June 6, 2011.

**The Facts**

The facts are set forth in the DOCS Defendants' Statement Pursuant to Local Rule 56.1, the Rule 56.1 Statement of Dr. Wandel, and the Plaintiff's Statements of Fact Pursuant to Rule 56 in Opposition of Defendants' Motion for Summary Judgment, Plaintiff's Statement Pursuant to Local Rule 56.1, the Supplemental Expert Report and Supplemental Affidavit of Dr. Wandel, Plaintiff's Reply to Defendants' Supplemental Rule 56.1 Statement, and Plaintiff's Declaration filed October 4.  The facts are not disputed except as noted below.

Gonzalez has been in the custody of the New York State Department of Correctional Services since 1982, and is currently incarcerated at the Mid-Orange Correctional Facility ("Mid-Orange").  Gonzalez brought this complaint pursuant to 42 U.S.C. § 1983, claiming that DOCS personnel violated his constitutional

rights while he was incarcerated at DOCS' Otisville Correctional
Facility ("Otisville").  The DOCS' Defendants are former and
current DOCS' officials and are, with one exception, represented
by the Office of the Attorney General ("OAG").  The exception is
Defendant Robert J. Ebert ("Ebert") who has not been served with
the complaint and is not represented by OAG.  Gonzalez states
that he did not receive any information from the U.S. Marshall's
Office in regards to service of the complaint on Ebert.  As
described above, Gonzalez filed three grievances prior to filing
the present lawsuit.

Gonzalez obtained his GED in the United States in
1985.  The preparation courses that Gonzalez took for the
English section of the GED were conducted in English.  Gonzalez
also testified that he learned English through his conversations
with inmates and DOCS' employees.  Gonzalez has stated that his
deposition established that there is a question as to whether he
understood the medical procedures at issue in this case and
their attendant risks.

Prior to meeting Dr. Wandel, Gonzalez was able to
understand directions in English, and, in his deposition
testimony, stated that he understood "the beginning of a
conversation . . . I may pick up some things."  Gonzalez Dep. at

8

23.  Gonzalez testified that he reads the sports section of the
Daily News, and understands "[n]ot everything, but I understand
parts of it."  Id. at 24.  Additionally, Gonzalez testified that
he watches sports in English on television.  Gonzalez also
completed courses at Orange County that were conducted in
English without a Spanish interpreter and received certification
certificates for work with small engines and spray painting.
Gonzalez has denied that he understood the risks of surgery.
When asked to describe glaucoma during his deposition, Gonzalez
stated, in English, that "[t]he doctor said that because of
people's age, they can lose the vision."  Id. at 75-76.
Regarding the condition of his health, Gonzalez has stated there
is a factual issue concerning his understanding of his diabetes.


Gonzalez was able to respond to questions during his
deposition without the aid of a Spanish interpreter.  While
Gonzalez' June 7, 2004 grievance is typed in Spanish, his June
23, 2004 appeal is not.  Gonzalez' June 8, 2004 letter to Dr.
Wright is in Spanish, but his August 9, 2004 letter to Dr.
Wright is in English.  Gonzalez' December 28, 2006 grievance is
handwritten in English.  Gonzalez' English letters do not inform
the reader that the letter could have been dictated in Spanish
by Gonzalez to another individual, nor do the English letters
invite the recipient to respond in Spanish.  Gonzalez has stated

9

there is a factual issue concerning his understanding of the
grievances, the complaint and English, as Gonzalez has stated
that the papers filing his grievances and complaint were drafted
for him by other inmates.

Gonzalez testified that medical staff "explained to me
that glaucoma is too close my eye [sic], to anybody that has
glaucoma, and for that reason they give you the laser
procedure." Id. at 100.  When Gonzalez agreed to the first
procedure, he testified that, "I was thinking that I was going
to see perfectly." Id. at 103.  Gonzalez testified that his
understanding of the second procedure was that, "I was going to
see better because I was blind already." Id. at 107.  Gonzalez
contends that these statements present a question of fact
regarding the extent Gonzalez understood glaucoma and the risks
of laser surgery.  During his deposition, Gonzalez was able to
read and understand various terms written in English on the
"Consent for Surgery" form he signed prior to his first surgery,
including his name, the date, "description of procedure to be
undertaken," "laser," "eye," "right," "glaucoma," "patient,"
"nature," and "procedure." Id. at 47-49.  Gonzalez did not ask
for anyone to explain the information on the "Consent for
Surgery" and "Consent for Laser Photocoagulation" forms.
Gonzalez has stated that his lack of questions evinces his

ignorance and that the consent form was signed in the wrong place.

Gonzalez testified that he met with Dr. Sarreck between five and ten times with regards to treatment for his diabetes.  Apart from one instance where Dr. Sarreck allegedly informed Gonzalez that he had glaucoma, Gonzalez did not see Dr. Sarreck for glaucoma treatment.  Gonzalez has stated he was confused by this line of questioning when he gave his answers at his deposition.  Gonzalez testified that he brought suit against Byrnes because "she has something to do with the Department of Corrections," id. at 203-04, and because the other inmates told him to sue her, that he brought suit against Bellamy because she was the "head of grievance" and that he brought suit against Eagen because "he has something to do with me."  Id. at 207. Gonzalez has stated that he is a layman who does not understand the concepts and legal intricacies of filing a civil rights lawsuit and relied on other inmates in drafting his complaint.

DOCS' records show that Gonzalez obtained ophthalmologic care on March 11 and 21, 2003, May 8, 2003, June 30, 2003, July 29, 2003, October 3 and 14, 2003, February 9, 2004, May 21, 2004, June 3, 2004, July 14, 2004, August 9, 2004, December 2, 2004, March 14, 2005, May 26, 2005, June 10, 2005,

11

June 17, 2005, July 20, 2005, September 19, 2005, October 6,
2005, October 26, 2005, December 16, 2005, January 20, 2006, May
11, 2006, July 14, 2006, July 28, 2006, December 7, 2006, April
13 and 26, 2007, May 18 and 22, 2007, August 24, 2007, September
12, 2007, and December 7, 2007.  The industry accepted practice
for follow-up examinations for an individual with Plaintiff's
condition is at least three to four months.  Gonzalez has stated
that his belief that an expert might challenge the industry
accepted practice.  In all, from 2002 until 2009, Gonzalez was
seen at least 42 times by ophthalmologists and optometrists,
including receiving at least eight visual field tests.  Gonzalez
was treated for several ophthalmic conditions by at least three
ophthalmologists – Dr. Zabin, Dr. Josephberg and Dr. Wandel.
Gonzalez has stated there is a question concerning whether he
received adequate and appropriate treatment and whether
Defendants' actions boarded on "deliberate indifference" in
treating his glaucoma with laser surgery.

        Gonzalez was diagnosed with Open Angle Glaucoma,
Background Diabetic Retinopathy, and symmetrical advanced optic
nerve cupping in June 2002 by Dr. Josephberg and Dr. Zabin.  He
was placed on medication and was seen again by Dr. Zabin on
November 14, 2002, where he was diagnosed with Chronic Angle
Closure Glaucoma.  Dr. Zabin referred Gonzalez to Dr. Wandel for

a laser peripheral iridotomy ("LPI"), a procedure that was
indicated because of high intraocular pressure in Gonzalez'
right eye.  Gonzalez has stated that there is no indication in
his medical records that the medication therapy was not working
and that laser surgery may not have been mandatory to relieve
the intraocular pressure.

On May 2, 2003, Gonzalez received surgical treatment
in the form of an LPI.  Gonzalez' intraocular pressures returned
to normal in each eye.  The Defendants' expert, Dr. Orloff,
regards LPI as a low risk vision saving procedure, associated
with minimal discomfort, no recovery period, and low risk of
visual acuity loss.  Gonzalez disputes that it was Dr. Wandel
who performed the surgery, instead claiming that a resident or
intern performed the procedure.  Gonzalez states that error
performed by this "student" caused blindness in his right eye.

On September 2, 2003, four months following the
surgery, Gonzalez complained of a loss of vision in his right
eye and his visual acuity was found to be 20/200 in his right
eye and 20/20 in his left eye.  Noting that two more surgeries
were required after the initial May 2 LPI, Gonzalez has stated
that a factual issue exists as to whether his surgery was

13

successful and whether a different surgical technique would have
saved his vision.

Dr. Wandel saw Gonzalez on October 3, 2003, finding
that his visual acuity in the right eye had decreased and noting
optic nerve damage as indicated by an Afferent Pupilary Defect
in the right eye.  Between May 21, 2004 and August 6, 2004,
Gonzalez' visual acuity in his right eye ranged between 20/200
and Count Fingers and 20/20 in his left eye, with intraocular
pressures between 17 and 32 in the right eye and between 12 to
20 in the left eye.  Gonzalez was prescribed topical medications
for his intraocular pressure and was told by Dr. Wandel that he
needed an LPI for his left eye.  Gonzales refused the procedure
on the belief that the earlier procedure blinded his right eye.
Gonzalez was followed during 2004 and 2004 with stable 20/200-
Count Fingers vision in his right eye, 20/20-25 vision in his
left eye, and adequately controlled intraocular pressures.  On
September 16, 2005, Gonzalez had an intraocular pressure of 32
in his right eye and Dr. Wandel performed a surgical
trabeculectomy on the eye on or about October 18, 2005.  In
2008, Gonzalez was diagnosed with hemi-retinal vein occlusions
in both eyes, unrelated to his glaucoma.  Gonzalez is now under
the care of Dr. Josephberg at the Westchester Medical Center,
has undergone additional ophthalmologic procedures, and claims

14

his eye is "a lot better".  Gonzalez has stated that his
deposition testimony referred only to the pain in his eye, not
his vision.

Dr. Sarreck has been the Facility Health Services
Director of Otisville from 1990 to the present.  He is
responsible for the administration of health care services to
Otisville's inmate population, including the approval of inmate
consultations with medical specialists.  In Gonzalez' case, Dr.
Sarreck approved many of Plaintiff's visits to ophthalmology
specialists, including Dr. Wandel and Dr. Zabin.  Dr. Sarreck
did not treat Gonzalez' glaucoma.  Through DOCS, Gonzalez
obtained and signed Contract for Specialty Care Appointment
forms prior to individual appointments with a specialist
(documents were signed by Gonzalez prior to his May 21, 2004,
June 3, 2004, July 14, 2004, August 9, 2004, March 14, 2005,
December 7, 2006, and May 22, 2007 appointments).  The forms
reflect Gonzalez' need to see a specialist and his
responsibility to keep scheduled appointments.  The forms do not
explain what care would be administered at the scheduled
appointment, or explain the risks or benefits of such care.

Dr. Sarreck is not a specialist in ophthalmology and
deferred to Gonzalez' ophthalmologic specialists to recommend

15

the proper course of treatment, to use their expert judgment concerning the necessity of procedures to correct Plaintiff's glaucoma, and to explain the risks and benefits of such procedures and treatments.  Gonzalez has stated that, because Dr. Sarreck is responsible for referrals to specialists, a factual dispute exists with respect to Dr. Sarreck's negligence and deliberate indifference.  During Dr. Sarreck's interactions with Gonzalez, Dr. Sarreck spoke to Gonzalez in English and he would respond in English.  Gonzalez never discussed with Dr. Sarreck an inability to comprehend the English language, nor did he express any concern regarding misunderstanding or miscomprehension of what his specialists or Dr. Sarreck were conveying to him regarding medical care.  Gonzalez has stated he complained to Dr. Sarreck about his treatment on several occasions.

Dr. Wright is Deputy Commissioner and DOCS' Chief Medical Officer.  As Chief Medical Officer he is responsible for the development and implementation of medical policies and practices for inmates who are in DOCS' custody.  Dr. Wright is not Gonzalez' personal physician and has never treated him. Gonzalez has stated that Dr. Wright may be held responsible in his official capacity as a policy maker who promulgated the policy and procedures responsible for Gonzalez' loss of vision.

16

In the absence of overriding concerns, inmate letters sent to
Dr. Wright concerning medical care are assigned to a Regional
Health Services Administrator or a Regional Medical Director in
charge of overseeing the facility in which the inmate is housed.
Inmate concerns are then investigated by the appropriate
regional staff, which responds to the inmate in Dr. Wright's
name.  Gonzalez' correspondence to Dr. Wright were assigned to
and answered on his behalf by Byrnes.

        Byrnes was a Regional Health Services Administrator
for DOCS New York City Hub region from 2002 to 2006.  As
Regional Health Services Administrator, Byrnes was responsible
for overseeing health services to the inmate population in her
region, including responding to complaints by inmates regarding
medical treatment.  Although Otisville is not within the New
York City Hub, Byrnes would often cover the duties of
administrators of other regions – including Otisville's region –
while they were absent or on vacation.  Byrnes did not medically
treat Plaintiff at any time during his incarceration.  On July
28, 2004 and October 13, 2004, Byrnes responded to letters from
Gonzalez to Dr. Wright concerning medical care at Otisville.
Byrnes' responses to Gonzalez' concerns regarding medical
treatment were made after consulting with Gonzalez' treating
physicians and reviewing his medical records.  On January 21,

17

2005, Gonzalez sent copies of a Grievance Complaint regarding
medical treatment at Otisville to Byrnes and Dr. Wright.   On
February 15, 2005, Byrnes issued a report following an
investigation into the matter, concluding that Gonzalez was
receiving adequate medical treatment.

Bellamy was the Assistant Director and Eagen was the
Director of DOCS' Inmate Grievance Program ("IGP") at the time
Gonzalez filed his three grievances.  The IGP Director is the
custodian of records maintained by CORC, the body that renders
final IGP administrative decisions.  The IGP Director is also
responsible for the administration of IGP and the implementation
of CORC decisions.  IGP Directors are not voting members of CORC
and do not make decisions regarding inmate appeals to CORC.  As
IGP Director, Eagen signed two of Gonzalez' appeal
determinations as part of his administrative duties.  As IGP
Assistant Director, Bellamy signed one of Gonzalez' CORC appeal
determinations as part of her administrative duties.

Gonzalez' medical records reveal that Gonzalez had a
history of diabetes, which he was treating with insulin
injections, and Gonzalez also suffered from both chronic open
angle glaucoma and diabetic retinopathy.  As of September 30,
2002, Gonzalez was taking Xalatan and Timoptic to treat his

18

glaucoma.  As an inmate of the DOCS, Gonzalez was referred to
Dr. Wandel at the Westchester Medical Center Glaucoma Clinic by
DOCS doctors.  A November 14, 2002 consult report states
Gonzalez' visual acuity was 20/25 in both eyes and noted high
intraocular pressure in both right and left eyes as a result of
glaucoma.  A DOCS "Request and Report of Consultation" from that
day advised referral to Dr. Wandel "ASAP".  On December 13,
2002, reports from the Glaucoma Clinic again advised of
Gonzalez' high intraocular pressure and increased cup-to-disc
ratios (both indicative of glaucoma), and referred Gonzalez to
Dr. Wandel, recommending performance of laser peripheral
iridectomies.  A DOCS "Request and Report of Consultation" form,
dated April 2, 2003, notes that Gonzalez was seen in the
Glaucoma Clinic on March 25, 2003 and was advised to see Dr.
Wandel "soon."  The lower section of the form, labeled
"Consultant Report" and signed by Dr. Wandel, notes "Laser PI
[peripheral iridotomy] done today.  RTC [return to clinic] 2
weeks."  The bottom of the form is pre-printed with the words
"Consultation is a recommendation.  Final determination will be
made by the inmate's NYSDOCS physician."

On May 2, 2003, a laser peripheral iridotomy was
performed on Gonzalez' right eye.  The Laser Procedure
Documentation Form is signed by Dr. Wandel.  Pre-op visual

19

acuity of Gonzalez' right eye is noted as 20/40; post-op is
listed as 20/50.  Pre-op intraocular pressure is listed as 35;
post-op as 25.  The post operative instructions are "post prcd
f/u@3 days" (post procedure follow-up at three days).  A form
entitled "Consent Form Laser Photocoagulation," dated May 2,
2003, is signed by Gonzalez, Dr. Wandel and Shirley Bollin (Dr.
Wandel's Office Manager).  Both Gonzalez and Bollin signed on
the "Witness" line, leading Gonzalez to question the validity of
his consent.  Dr. Wandel saw Gonzalez for a follow-up visit on
June 27, 2003.  At that time, his right-eye visual acuity was
20/60 and his intraocular pressure was 17.  The progress note
states that the peripheral laser site – "PL" - was not open and
notes "need touch up OD [right eye]."  It is signed by Dr.
Wandel.  A DOCS "Request and Report of Consultation" form dated
June 30, 2003, reports that the intraocular pressure in both of
Gonzalez' eyes was 17 and visual acuity was 20/60 and 20/40.
This same form ordered a visual field test.  Another "Request
and Report of Consultation" form, also dated June 30, notes that
a visual field test was scheduled for July 29, 2003, and
Gonzalez' records include a visual field test dated July 29,
2003.  A third June 30, 2003 DOCS "Request and Report of
Consultation" form refers Gonzalez to Dr. Wandel for narrow
angle glaucoma.  The bottom of the form, signed by Dr. Wandel on
October 3, 2003, notes that Gonzalez complained of decreased

vision in his right eye over the past two weeks.  This loss in function of the right eye was confirmed, and Gonzalez' his right and left eye vision was CF (Count Fingers) at one foot and 20/25, respectively.  Intraocular pressure in the right and left eye was 24 and 20, respectively.  The plan includes a note, "RTC [return to clinic] 10/7/03 1PM for IOP [check]/."  Changes in medication were recommended.

Dr. Wandel saw Gonzalez again on November 14, 2003. Visual acuity was noted as CF (right eye) and 20/20 (left eye). Intraocular pressure was measured at 32 (right eye) and 15 (left eye).  Medication management was noted.  It was also noted that the intraocular pressure in Gonzalez' eyes remained elevated despite maximum medical therapy.  It was recommended that Gonzalez return to the Clinic with Dr. Que to consider a "trab" (trabulectomy) of the right eye versus revision of the LPI (laser peripheral iridectomy).

A DOCS "Request and Report of Consultation" form, dated November 21, 2003, referred Gonzalez to Dr. Que to consider a trabulectomy versus a revision of the LPI.  The bottom portion of the form is signed by Dr. Wandel.  While the bottom of the form is not dated, it bears identical information to the Glaucoma Exam Sheet, dated February 6, 2004.  Dr. Wandel

21

directed that the follow-up LPI be performed as "soon as possible (3-4 wks)".  On February 6, 2004, Gonzalez again saw Dr. Wandel.  Visual acuity was unchanged.  Intraocular pressure in each of Gonzalez' eyes was 18 and 12.  Medication management was continued and the touch-up LPI of the right eye was scheduled because intraocular pressure was "above goal".

A DOCS "Request and Report of Consultation" form, dated February 9, 2004 referred Gonzalez for a revision of the right eye LPI.  The bottom of the form is signed by Dr. Wandel on May 21, 2004 and recommends the procedure.  Visual acuity was unchanged and intraocular pressure was 14 and 10.  It also recommends that Gonzalez return to the clinic in 2-3 weeks for a laser of the left eye.  A Laser Procedure Documentation Form reflects that the procedure was done.  A consent form, dated May 21, 2004, was signed by Gonzalez, Dr. Wandel, and Shirley Bollin.  Again, Gonzalez signed on the line for the witness rather than the patient.  A DOCS "Request and Report of Consultation" form, dated May 24, 2004, notes that Gonzalez underwent the right eye revision and refers him for a laser procedure on the left eye.  The bottom portion of the form, signed by a doctor other than Dr. Wandel on June 3, 2004, notes that Gonzalez complained that the "laser made eye worse."  The note adds "I explained to patient he needs glaucoma therapy of

22

L. eye.  He does not understand."  Gonzalez was to return to see
Dr. Wandel.

A DOCS "Request and Report of Consultation" form,
dated June 7, 2004, refers Gonzalez to Dr. Wandel for laser of
the left eye (OS).  It states "refuses, States cannot see out of
R eye & is afraid to have L eye done."  The bottom portion of
the form, signed by a doctor other than Dr. Wandel on July 14,
2004, notes that Gonzalez is to see Dr. Wandel for follow up and
treatment.  "Please schedule ASAP".  On August 6, 2004, Gonzalez
was seen by Dr. Wandel.  Visual acuity was CF and 20/20, and
intraocular pressure was 17 and 16.  However, cup-to-disc ratios
were increasing and Gonzalez was at risk for acute left eye
angle.  Gonzalez refused a left eye LPI.  The plan was to
continue the medication management and follow up in six months.
A "Chronic Medication Provider Order Form" reflects that Cosopt
and Xalatan (eye medications) were ordered throughout the
period.  Gonzalez was seen by another unnamed eye care provider
on December 2, 2004.

On March 11, 2005, Gonzalez was seen by Dr. Wandel.
It was noted that the right eye was blind, secondary to angle
closure.  Gonzalez was told of the need to treat the left eye,
but "refused + accepted risk of blindness".  On June 10, 2005,

23

Gonzalez was seen by Dr. Zabin.  His visual acuity was noted to
be CF and 20/25.  Intraocular pressure was elevated at 30 and
16.  It was again noted that he refused a left-eye iridectomy.
On June 17, 2005, visual acuity was noted to be CF and 20/20,
and intraocular pressure was noted to be 18 and 22.  Gonzalez'
refusal of a left-eye iridectomy was again noted.

On September 16, 2005, visual acuity was noted to be
CF and 20/20 and intraocular pressure was 32 and 18.  It was
noted for the first time that Gonzalez complained of right eye
pain and headaches.  A trabeculectomy was planned.  On October
18, 2005, Dr. Wandel performed a trabeculectomy on Gonzalez'
right eye in treatment of Gonzalez' glaucoma.  The "Westchester
County Medical Center Nursing Discharge Summary" directed
Gonzalez to return for a follow-up appointment on October 28,
2005.  On October 26, 2005, Gonzalez returned for follow-up.  A
DOCS "Request and Report of Consultation" form dated October 26,
2005 notes that Gonzalez was doing well post surgery and may
return to general population.  Intraocular pressure was measured
at 8 and 21.  On December 16, 2005, loose sutures were removed
and medication management continued.  Visual acuity was CF and
20/20, and intraocular pressure was measured at 9 and 16.

Dr. Wandel saw Gonzalez on January 20, 2006.  Visual
acuity was CF and 20/25, and intraocular pressure was measured
at 9 and 10.  On May 11, 2006, visual acuity was CF and 20/25,
and intraocular pressure was measured at 8 and 11. Follow-up and
visual field testing was advised in two months.  Visual field
testing was completed on July 21, 2006.  When Dr. Wandel saw
Gonzalez on July 28, 2006, visual acuity was CF and 20/20, and
intraocular pressure was measured at 16 and 19.  It was noted
that "IOPs need to be lowered."  Gonzalez' medication was
adjusted, and a follow up in two to three months was directed.

Dr. Wandel next saw Gonzalez on April 13, 2007.
Visual acuity was HM (hand motion) and 20/15, and intraocular
pressure was measured at 26 and 30.  The medical records note
the presence of advanced glaucoma and that intraocular pressure
was not controlled.  The records state that it was "unclear why
pt only on Cosopt," and a recommendation was made to change
Gonzalez' medication.  Gonzalez states that this order changing
his medication raises a factual questions concerning whether Dr.
Wandel prescribed the correct medication or whether correctional
facility medical employees incorrectly followed Dr. Wandel's
orders, thereby negligently exacerbating Gonzalez' loss of
vision.  Dr. Wandel saw Gonzalez on May 22, 2007.  Visual acuity
was HM (hand motion) and 20/25, and intraocular pressure was

measured at 14 and 15. Gonzalez was instructed to continue taking Cosopt and Xalatan. On August 24, 2007, intraocular pressure in each eye measured 18, and the medical records described it to be "on target." The records also note that the combination of Cosopt and Xalatan was working. Visual acuity was HM and 20/25.

On December 7, 2007, intraocular pressure in each eye had risen to 21 and was considered to be "above therapeutic goal." Gonzalez' prescription was changed from Xalatan to Travatan. Gonzalez was directed to return in three months. On March 7, 2008, Gonzalez' visual acuity was CF and 20/20, and intraocular pressure in each eye measured 18. Visual field testing was ordered. On April 29, 2008, visual field testing was consistent with glaucoma of the left eye, and the right eye had no image. A repeat test was ordered for six months later. Gonzalez alleges that he complained about blindness in his right eye prior to March 7, 2008 and that a test was done on March 13, 2008 verifying that Gonzalez was blind in his right eye.

At his deposition, Gonzalez testified that the Complaint was not prepared by him personally, and he did not read it before signing it. Gonzalez states that he was assisted by an inmate law clerk at Green Haven Correctional Facility, who

26

Gonzalez states may not have been qualified to properly draft
plaintiff's complaint pursuant to 42 U.S.C. § 1983.  Gonzalez
states that, regardless of the deficiencies in the Complaint, he
should not be held to the heightened pleading standards of a
licensed lawyer.

Gonzalez, during his deposition, responded to
questions before the interpreter had an opportunity to translate
and sometimes answered in English.  Gonzalez states that this is
irrelevant to the question of whether he understood the
questions posed to him during the deposition proceedings.
Gonzalez testified that he did not request an interpreter at Dr.
Wandel's office and one was not made available.  An employee at
Dr. Wandel's office did speak Spanish and, on one occasion, when
Gonzalez asked for a translator's help, Gonzalez was aided by
this employee.  Gonzalez was told that if he did not get the
procedure on the right eye he would go blind and that if he had
any questions about the operation, he could ask them.  Gonzalez
did not ask any questions.  Gonzalez denies that the employee in
Dr. Wandel's office adequately explained the medical procedures
being performed and that Gonzalez did not give his informed
consent to the operations.  Gonzalez states that he was confused
by the questions at his deposition and that the reason he did

27

not ask any questions concerning his operations is because he lacked the ability to adequately express his concerns.

Gonzalez testified that he understood that the first procedure was intended to reduce the pressure in his eye and that glaucoma was closing his eye.  He also testified that he was not told either that he would go blind from the procedure or that he would see better after the procedure.  Gonzalez states that he thought he would see perfectly after the operations and that he was taking medication for his glaucoma between the first and second procedure.

On June 29, 2010, Dr. Paul N. Orloff, a Diplomate of the American Board of Ophthalmology Diseases and Surgery of the Eye, issued an expert review report on behalf of Dr. Wandel. Dr. Orloff reviewed the relevant medical records, as well as the deposition transcripts and the complaint in preparing his report and concluded that Dr. Wandel's treatment of Gonzalez was consistent with good and accepted community standards of applicable ophthalmologic procedure.  Dr. Orloff noted that Gonzalez was being treated for his ophthalmic conditions by at least three ophthalmologists:  Dr. Zabin, Dr. Josephberg and Dr. Wandel.  Dr. Orloff opined that by Gonzalez' August 6, 2004 appointment with Dr. Wandel, Gonzalez' right eye visual acuity

28

was very limited (count fingers) and that Dr. Wandel likely felt
that aggressive treatment to lower the intraocular pressure was
not appropriate.  The left eye was being adequately controlled
with topical medication.  As such, Dr. Orloff opines that a
three to four month wait for a follow up would be reasonable.
The DOCS records reveal that Gonzalez saw an eye care
professional on December 2, 2004.

Dr. Orloff noted that Gonzalez underwent his first
laser peripheral iridotomy with Dr. Wandel on May 2, 2003 and
opined that the procedure was "indicated and uneventful" since
it was successful in lowering Gonzalez' right eye intraocular
pressure and his vision was only slightly diminished as of June
30, 2003 and that there was no immediate urgency to the follow-
up LPI which Dr. Wandel ordered.  With respect to the issue of
whether it would be appropriate for a resident to perform the
procedure under Dr. Wandel's supervision, Dr. Orloff, through
defense counsel, has stated that, in a teaching hospital such as
Westchester Medical Center, residents perform procedures that
are within their range of abilities under the direct supervision
of an experienced and qualified attending physician.  See
Mayouhas Decl. at 3-4.  Dr. Orloff notes that no reason is noted
for Gonzalez' vision loss on September 2, 2003, but speculates
as to possible causes, such as a retinal vein occlusion or

29

ischemic optic neuropathy.  Dr. Orloff noted that an LPI is not
a vision threatening procedure, with the primary risks being the
development of a cataract and a transient increase in
intraocular pressure.  Dr. Orloff also noted that an LPI is
regarded as a low risk vision saving procedure which causes
minimal discomfort, does not require a recovery period and is
associated with a very low risk of visual acuity loss.  He
stated that, in his 30 years of professional experience, he has
not encountered a patient who refused the procedure after the
risks, benefits and alternatives had been explained.

Gonzalez disputes Dr. Orloff's conclusions and
attaches excerpts from two publications to Plaintiff's Reply to
Defendant's Supplemental Rule 56.1 Statement: "Glaucoma: What
You Should Know," published by the U.S. Department of Health and
Human Services, and a second publication from an organization
called Research to Prevent Blindness.  Gonzalez argues that both
organizations agree that a trabulectomy carries a 80-90% success
rate in relieving intraocular eye pressure, whereas laser
surgery is often unsuccessful and requires repeated surgeries.
Gonzalez states that Dr. Orloff never examined him and is
incorrect in his opinion concerning how Gonzalez lost his sight.

30

Dr. Wandel has testified by affidavit that on October 3, 2003, Gonzalez reported to him that he had decreased vision in his right eye for the past two weeks, that his right eye visual acuity was Count Fingers (CF) and that the sudden loss of vision was likely due to increasing intraocular pressure further closing his already limited visual field. Dr. Wandel stated that he never refused to treat Gonzalez and specifically did not refuse to treat him following his refusal to have an LPI performed on his left eye.

On August 6, 2004, Dr. Wandel directed that Gonzalez' medication management by his other ophthalmologists continue and that he return to the clinic in six months. Dr. Wandel also noted that Gonzalez had been consistently refusing laser treatment of his left eye, that his right eye intraocular pressure was being adequately controlled with medication, and that there was no reason for him to be brought to the clinic earlier. Gonzalez states that there is a factual dispute as to whether an earlier appointment was required. Dr. Wandel testified that at both the May 2003 and May 2004 procedures, Gonzalez signed a consent form which was also signed by his office manager, Shirley Bollin, and that prior to having the patient sign the form, Dr. Wandel explained to him the risks, benefits and alternatives to the procedures. Gonzalez has

31

stated a factual issue exists as to his understanding of the risks, the adequacy of any translation and whether the form was properly signed.

Dr. Wandel testified that it is his custom and practice, when presented with a Spanish-speaking patient who does not adequately understand English, to have one of his Spanish-speaking staff members translate the risks, benefits and alternatives of a given procedure to the patient, that Bollin speaks some Spanish and that there is always a fluent, Spanish-speaking, front-desk staff member available to translate more extensively if necessary. Dr. Wandel stated that one of his Spanish-speaking front desk staff members explained the risks, benefits and alternatives of a Laser Peripheral Iridotomy and touch up procedure to Gonzalez in Spanish. Gonzalez has denied the adequacy of the translation. Dr. Wandel stated that Gonzalez' vision loss was due to the advancement of his glaucoma and that his vision loss was unrelated to the treatment rendered to him.

**Summary Judgment Standard**

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any

32

affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(c).  The courts do not try
issues of fact on a motion for summary judgment, but, rather,
determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986).

     "The party seeking summary judgment bears the burden
of establishing that no genuine issue of material fact exists
and that the undisputed facts establish [its] right to judgment
as a matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051,
1060-61 (2d Cir. 1995).  Summary judgment is appropriate where
the moving party has shown that "little or no evidence may be
found in support of the nonmoving party's case.  When no
rational jury could find in favor of the nonmoving party because
the evidence to support its case is so slight, there is no
genuine issue of material fact and a grant of summary judgment
is proper."  Gallo v. Prudential Residential Servs., L.P., 22
F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  In
considering a summary judgment motion, the Court must "view the
evidence in the light most favorable to the non-moving party and

33

draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation omitted).

In addressing the present motion, the Court is mindful that Gonzalez is proceeding pro se and that his submissions are held to "less stringent standards than formal pleadings drafted by lawyers . . . ." Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The courts "construe the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments they suggest." Fuller v. Armstrong, 204 Fed. Appx. 987, 988 (2d Cir. 2006); see also Lerman v. Bd. of Elections in City of N.Y., 232 F.3d 135, 139-40 (2d Cir. 2000) ("Since most pro se plaintiffs lack familiarity with the formalities of pleading requirements, we

34

must construe <u>pro</u> <u>se</u> complaints liberally, applying a more flexible standard to evaluate their sufficiency that we would when reviewing a complaint submitted by counsel."). However, the courts will not "excuse frivolous or vexatious filings by <u>pro</u> <u>se</u> litigants," <u>Iwachiw v. New York State Dep't of Motor Vehicles</u>, 396 F.3d 525, 529 n.1 (2d Cir. 2005), and "<u>pro</u> <u>se</u> status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006) (quoting <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983)).

## The Claims Against Defendant Ebert Are Dismissed

To date, Defendant Ebert has not been properly served with the Complaint. Since it is past 120 days from the time Gonzalez filed the Complaint, the Complaint against Ebert is dismissed. See FRCP 4(m).

## The Claims Against Defendants Eagen, Bellamy and Dr. Wright Are Dismissed

Gonzalez has failed to establish that the DOCS Defendants Eagen, Bellamy, and Dr. Wright were sufficiently involved in the conduct upon which Gonzalez bases his § 1983

35

claim.  See <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 154 (2d

Cir. 2001); <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995)

("[p]ersonal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under §

1983.") (internal quotation omitted); see also <u>Sash v. United</u>

<u>States</u>, 674 F. Supp. 2d 531, 542 (S.D.N.Y. 2009) (citing cases).

To assert a § 1983 violation, the personal involvement of a

supervisory official may be established when:

> (1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after
> being informed of the violation through a report or
> appeal, failed to remedy the wrong, (3) the defendant
> created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the
> defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5)
> the defendant exhibited deliberate indifference to the
> rights of inmates by failing to act on information
> indicating that unconstitutional acts were occurring.

<u>Colon</u>, 58 F.3d at 873.[3]

---

[3]    It should be noted that, although the Second Circuit has
not yet weighed in on what remains of <u>Colon</u> after <u>Ashcroft v.</u>
<u>Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009),
several decisions in this district have concluded that by
specifically rejecting the argument that "a supervisor's mere
knowledge of his subordinate's discriminatory purpose amounts to
the supervisor's violating the Constitution," <u>Iqbal</u>, 129 S.Ct.
at 1949, <u>Iqbal</u> effectively nullified several of the
classifications of supervisory liability enunciated by the
Second Circuit in <u>Colon</u>.  See, e.g., <u>Bellamy v. Mount Vernon</u>
<u>Hosp.</u>, No. 07 Civ. 1801(SAS), 2009 WL 1835939, at *4, 6

Merely "affirming the administrative denial of a prison inmate's
grievance by a high-level official is insufficient to establish
personal involvement under section 1983." Manley v. Mazzuca,
No. 01CV5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19,
2007); see also Warren v. Goord, 476 F. Supp. 2d 407, 413
(S.D.N.Y. 2007) (dismissing a complaint where "plaintiff does
not explain how a denial of a grievance violates plaintiff's
constitutional or federal rights so as to state a claim under
§ 1983"). Both the Court of Appeals and numerous district
courts in this Circuit have held that receipt of letters or
grievances is insufficient to impute personal involvement.
Voorhees v. Goord, No. 05 Civ. 1407(KMW)(HBP), 2006 WL 1888638,
at *5 (S.D.N.Y. Feb. 24, 2006) (collecting cases). Broad,
conclusory allegations that a high-ranking defendant was
informed of an incident are also insufficient. See, e.g.,
Hernandez v. Goord, 312 F. Supp. 2d 537, 547 (S.D.N.Y. 2004) (no

---

(S.D.N.Y. June 26, 2009) (holding that only the first and third
Colon categories survive Iqbal); Joseph v. Fischer, No. 08 Civ.
2824(PKC)(AJP), 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009)
("[p]laintiff's claim, based on [a supervisor's] failure to take
corrective measures, is precisely the type of claim Iqbal
eliminated."); Newton v. City of N.Y., 640 F. Supp. 2d 426, 448
(S.D.N.Y. 2009) ("passive failure to train claims pursuant to
section 1983 have not survived the Supreme Court's recent
decision in Ashcroft v. Iqbal]."). Because Gonzalez has failed
to meet any of the five factors, it is not necessary to decide
which of the Colon factors have survived Iqbal.

claim stated where plaintiff merely asserts that supervisor received letters of complaint).

With respect to Defendants Eagen and Bellamy, it must be noted that administrators are "permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if [they do] so." Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002). Non-medical Defendants, such as Eagen and Bellamy, may not be held liable on a deliberate indifference claim unless a plaintiff can show that such a non-medical Defendant should have challenged a doctor's diagnosis. See Cuoco v. Moritsugu, 222 F.3d 99, 111 (2d Cir. 2000). Gonzalez has presented no evidence that Eagen and Bellamy should have challenged a doctor's diagnosis or that they had any decision-making authority in the grievance process. Accordingly, the claims against Eagen and Bellamy are dismissed.

With respect to Defendant Dr. Wright, the handling of Gonzalez' complaints to Dr. Wright was assigned to Byrnes. That Dr. Wright may have delegated the matter to a subordinate does not establish that he was personally involved in a constitutional depravation. See Collins v. Goord, 581 F. Supp.

38

2d 563, 576 (S.D.N.Y. 2008) (because there was no evidence that administrator or second supervisor received or denied inmate's requests for photocopying advance, claim against them for denial of inmate's right of access to the courts was dismissed); Rivera v. Pataki, No. 04 Civ. 1286(MBM), 2005 WL 407710, at *22 (S.D.N.Y. Feb. 7, 2005); Amaker v. Goord, No. 98 Civ. 3634, 2002 WL 523371, at *16 (S.D.N.Y. Mar. 29, 2002) (letters sent to commissioner, where letters were delegated to other prison officials, were insufficient to establish supervisory liability). Accordingly, the claims against Dr. Wright are also dismissed.

## The Fourteenth Amendment Informed Consent Claim Is Dismissed

Gonzalez has asserted a violation of his Fourteenth Amendment rights arising out of the failure to properly inform him of the risks of his ophthalmologic course of treatment. Prior to the Second Circuit's decision in Pabon, courts in this Circuit recognized a prisoner's constitutional right to refuse medical treatment. See Cruzan v. Dir., Missouri Dep't of Health, 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). In Pabon, the Second Circuit held that an individual cannot exercise his established right to refuse medical treatment in a meaningful and intelligent fashion unless he has

39

sufficient information about the proposed treatment.  459 F.3d

241, 249-50 (2d Cir. 2006).  The Court held that an inmate has a

liberty interest in receiving medical information that a

reasonable patient would require in order to make an informed

decision as to whether to accept or reject proposed medical

treatment.  Id. (citing White v. Napoleon, 897 F.2d 103, 113 (3d

Cir. 1990)).


With respect to the remaining DOCS Defendants, Dr.

Sarreck and Byrnes, Gonzalez has failed to establish a

Fourteenth Amendment violation.  As described above, "[p]ersonal

involvement of defendants in alleged constitutional deprivations

is a prerequisite to an award of damages under § 1983."  Colon,

58 F.3d at 873.  With respect to Gonzalez' claim against Dr.

Sarreck and Byrnes that he did not receive adequate information

concerning the medical treatment of his glaucoma, Gonzalez has

not established the personal involvement of these defendants.


Although Gonzalez met with Dr. Sarreck between five

and ten times, Gonzalez' deposition testimony reveals that these

meetings concerned Gonzalez' diabetes and not his glaucoma.

Gonzalez Dep. at 178-79.  Other than one instance where Dr.

Sarreck informed Gonzalez that he had glaucoma, Gonzalez did not

see Dr. Sarreck for glaucoma treatment.  Accordingly, Dr.

40

Sarreck cannot be held liable for failing to inform Gonzalez of the risks of ophthalmologic treatment where Dr. Sarreck did not treat Gonzalez' glaucoma and was not in a position to discuss the risks of treatment that he did not provide.  Gonzalez has not asserted that he sought advice from Dr. Sarreck concerning ophthalmologic treatment.  Similarly, Byrnes did not treat Gonzalez or prescribe treatment during Gonzalez' incarceration. No evidence has been presented that Dr. Sarreck or Byrnes received adequate notice of Gonzalez' alleged concerns regarding informed consent.  Although Gonzalez lodged numerous grievances and appeals describing Dr. Wandel's "unprofessional behavior," the lack of adequate care and Gonzalez' desire to see a different specialist, nowhere in Gonzalez' Otisville complaints does he give notice to any DOCS personnel that he was not given adequate information concerning the Dr. Wandel's course of treatment.  Moreover, there is no evidence that the DOCS was placed on notice that Gonzalez had difficulty speaking and understanding English.  In fact, during Dr. Sarreck's interactions with Gonzalez, Dr. Sarreck spoke to Gonzalez in English and he would respond in English.  Sarreck Decl. ¶ 6.  As such, with respect to his claim that his Fourteenth Amendment rights were violated on account of Defendants' failure to provide him with adequate information concerning the treatment

41

of his glaucoma, Gonzalez has failed to prove sufficient
personal involvement of Dr. Sarreck or Byrnes.

With respect to Defendant Dr. Wandel, Gonzalez'
Fourteenth Amendment claim also fails.  To establish a violation
of the constitutional right to medical information, "a prisoner
must show that (1) government officials failed to provide him
with such information; (2) this failure caused him to undergo
medical treatment that he would have refused had he been so
informed; and (3) the officials' failure was undertaken with
deliberate indifference to the prisoner's right to refuse
medical treatment."  Pabon, 459 F.3d at 246; Lara v. Bloomberg,
No. 04 CV 8690(KMW)(HBP), 2008 WL 123840, at *4 (S.D.N.Y. Jan.
8, 2008).  "Inadvertent failures to impart medical information,"
"simple lack of due care," and "simple negligence" do "not make
out a violation of either the substantive or procedural aspects
of the Due Process Clause of the Fourteenth Amendment."  Pabon,
459 F.3d at 250-51; Lara, 2008 WL 123840, at *4.

Assuming arguendo that Gonzalez has satisfied the
first two prongs of the Pabon standard, the evidence establishes
that Dr. Wandel did not act with deliberate indifference.
Gonzalez testified that he understood that if he had any
questions about the operation, he could have asked them.  See

42

Gonzalez Dep. at 54.  Dr. Wandel has stated that his custom and
practice, when presented with a Spanish-speaking patient who
does not adequately understand English, is to have one of his
Spanish-speaking staff members translate the risks, benefits and
alternatives of a given procedure.  Wandel Aff. ¶ 11.  Dr.
Wandel has stated that Ms. Bollin, who served as a witness for
Gonzalez' consent forms, speaks some Spanish and that there is a
Spanish-speaking front-desk staff member available to translate
more extensively if necessary.  Id.  In Gonzalez' case, Dr.
Wandel recalls one of his Spanish-speaking front-desk employees
explaining the risks, benefits and alternatives of an LPI and
touch-up procedure to Gonzalez in Spanish.  Id. ¶ 12.  At his
deposition, Gonzalez testified that a "lady at Dr. Wandel's
office who spoke Spanish helped" him on one occasion, Gonzales
Dep. at 110-12, but the record is unclear as to whether this was
the occasion Gonzalez described in his deposition testimony
where Dr. Wandel's staff member assisted him.

There was never a time when Gonzalez requested an
interpreter at Dr. Wandel's office and one was not made
available.  Id. at 44-45.  Sometimes, Gonzalez spoke with Dr.
Wandel in English.  Id. at 89-90.  Prior to the May 2003 and May
2004 procedures, Gonzalez signed consent forms stating that the
risks and consequences of the procedure were explained to him

43

and that he had an opportunity to ask questions.  See Ex. C (two forms entitled "Consent Form Laser Photocoagulation," dated May 2, 2003 and May 21, 2004).  Given that Gonzalez sometimes spoke to Dr. Wandel in English, that he received a translator when he asked for one, that he was never refused access to a translator, and that he did not ask questions even though he knew he could have, the evidence establishes that any failure on the part of Dr. Wandel to not properly explain the procedures was inadvertent and did not amount to deliberate indifference. Accordingly, Gonzalez' Fourteenth Amendment claim against Dr. Wandel is also dismissed.  See Pabon, 459 F.3d at 250; Lara, 2008 WL 123840, at *4.

## The Eighth Amendment Deliberate Indifference Claim Is Dismissed

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment."  See Farmer v. Brennan, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that the Eighth Amendment is applicable to the treatment and conditions of confinement of prison inmates).  In addition, the Supreme Court has recognized a state's constitutional obligation to provide inmates with adequate medical care.  See id. at 832.  Deliberate indifference to the serious medical needs of someone in state

44

custody is a violation of the Eighth Amendment inasmuch as it is the equivalent of "unnecessary and wanton infliction of pain." See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In order for the plaintiff to state a cognizable claim under Section 1983 for inadequate medical care, an inmate must allege acts or omissions sufficiently harmful to evidence "deliberate indifference" to his serious medical needs. Estelle, 429 U.S. at 104.

In order to make out a constitutional claim under the deliberate indifference standard, Gonzalez must meet two requirements. First, Gonzalez' medical need must be "serious." See Flemming v. Velardi, No. 02 Civ. 4113 AKH, 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). Second, the facts must give rise to an inference that the persons charged with providing medical care knew of those serious medical needs and intentionally disregarded them. Flemming, 2003 WL 21756108, at *2; Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000); Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). In order to satisfy the second prong of the test, Gonzalez must establish that the Defendants acted with a sufficiently culpable mind. See Hathaway, 37 F.3d at 66 (to be liable, a defendant must

45

"know [] of and disregard [] an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw this inference.").  While Gonzalez has established his medical need to be "serious," Gonzalez has not established the DOCS Defendants or Dr. Wandel to have acted with a sufficiently culpable mind.

Regarding the first prong of the analysis, a plaintiff must show that the alleged deprivation is "sufficiently serious."  This standard contemplates a "condition of urgency, one that might produce death, degeneration or extreme pain." Hutchinson v. New York State Corr. Officers, No. 02 Civ. 2407(CBM), 2003 WL 22056997, at *5 (S.D.N.Y. Sept. 4, 2003). Only "those deprivations denying the 'minimal civilized measure of life's necessities' are sufficiently grave to from the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d (1992).  Since this matter concerns a degenerate eye condition, the objective component is satisfied.

For the second prong of the analysis, Gonzalez must demonstrate that the DOCS Defendants and/or Dr. Wandel acted with a "sufficiently culpable state of mind," knowing of and

46

disregarding an excessive risk to Gonzalez' health and safety.
See Seiter, 501 U.S. at 297; Hathaway, 37 F.3d at 66.
"Deliberate indifference is 'a state of mind that is the
equivalent of criminal recklessness.'" Hernandez v. Keane, 341
F.3d 137, 144 (2d Cir. 2003) (citation omitted). Gonzalez must
demonstrate that defendants "wish[ed] him harm, or at least,
[were] totally unconcerned with his welfare." Duane v. Lane,
959 F.2d 673, 677 (7th Cir. 1992). Negligence or mere
allegations of malpractice will not state a valid Eighth
Amendment claim. Estelle, 429 U.S. at 106 & n.14. Gonzalez
must allege conduct that is "repugnant to the conscience of
mankind" or incompatible with the "evolving standards of decency
that mark the progress of a maturing society." Id. at 105-06.
Gonzalez' allegations that eye surgery rendered him without
sight in his right eye is, without more, a malpractice claim and
does not implicate the Constitution. It is well settled that
"disagreements over medications, diagnostic techniques, forms of
treatment, or the need for specialists or the timing of their
intervention" are insufficient under § 1983. Woods v. Goord,
No. 01 Civ. 3255(SAS), 2002 WL 31296325, at *6 (S.D.N.Y. Oct.
10, 2002). Unsuccessful medical treatment alone does not give
rise to § 1983 liability. See Estelle, 429 U.S. at 106.

47

The evidence presented demonstrates that Dr. Wandel did not act with the requisite culpable state of mind. In this case Gonzalez has presented a disagreement with Dr. Wandel over his course of treatment and the need for surgical intervention, but, as described above, such disagreements are insufficient to establish a deliberate indifference claim. While Gonzalez alleged that the LPI caused him to lose vision in his right eye, nowhere in his complaint does Gonzalez allege that Dr. Wandel acted with deliberate indifference in assessing the need for an LPI. Gonzalez has argued that a resident performed the initial laser procedure on his eye, but Gonzalez has presented no evidence of any significant gap in treatment or that the treatment Gonzalez received was rendered with malice or ill-will.

Dr. Wandel's ophthalmologic expert, Dr. Orloff, opined that Dr. Wandel's treatment of Gonzalez was consistent with good and accepted community standards of applicable ophthalmologic procedure and that the initial procedure was "indicated and uneventful" since it was successful in lowering Gonzalez' right eye intraocular pressure and his vision was only slightly diminished as of June 30, 2003. Dr. Orloff opined that there was no immediate urgency for the follow-up LPI Dr. Wandel ordered. Dr. Orloff also notes that, while no reason is offered

48

in the records for Gonzalez' sudden vision loss months after the
procedure, an LPI is not a vision threatening procedure, with
the primary risks being the development of a cataract and a
transient increase in intraocular pressure.  Gonzalez has made
the claim that Dr. Wandel should have performed a trabulectomy
rather than an LPI.  However, Dr. Orloff opined that Dr. Wandel
acted within sound medical judgment and within community
standards in performing the initial LPI rather than a
trabulectomy because a trabulectomy is more invasive and
potentially dangerous and because a trabulectomy can always be
performed if the LPI appears to have failed.  Dr. Orloff further
opined that Dr. Wandel subsequently appropriately weighed the
substantial risks of performing a trabulectomy against a
revision of the LPI because Gonzalez' vision had already
decreased to and stabilized at Count Fingers and there is no
procedure which could have restored the vision.  Following
Gonzalez' complaint of eye pain and headaches, the risk-benefit
analysis shifted in favor of performing a trabulectomy in order
to relieve Gonzalez' discomfort.  Dr. Orloff concluded that Dr.
Wandel exercised appropriate medical judgment and acted within
the bounds of good and accepted medical practice in treating
Gonzalez.  Since Dr. Wandel exercised appropriate medical
judgment in treating Gonzalez, he was not deliberately
indifferent to his medical needs.  See Johnson v. Wright, 234 F.

49

Supp. 2d 352, 361 (S.D.N.Y. 2002) ("Generally, '[w]here the dispute concerns not the absence of help, but the choice of a certain course of treatment. . . . [a court] will not second guess the doctors.'") (citing Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987).

Gonzalez cited Hudak v. Miller, 28 F. Supp. 2d 827, 832 (S.D.N.Y. 1998) for the proposition that deliberate indifference may be demonstrated where a physician provided the same ineffective treatment over a period of time. That case involved a patient, who was eventually found to have a large aneurysm and who was ineffectively treated for migraines over a nine month period despite the fact that his symptoms were not consistent with migraines. However, Dr. Wandel considered the treatment options and weighed the risks of the options before him against their potential benefits. He was not deliberately indifferent in treating Gonzalez.

Since Dr. Wandel has established that he did not deviate from good and accepted medical practice, and because Gonzalez has not established a deliberate indifference to his medical needs, the Eighth Amendment claim against Dr. Wandel is dismissed.

50

With respect to Dr. Sarreck and Bynes, there is no
evidence that these defendants, or any of the other DOCS
Defendants, acted with any malice or ill-will toward Gonzalez
given their limited involvement with Gonzalez' ophthalmologic
care.  The record establishes that Gonzalez saw a host of
ophthalmologists during his incarceration and that his care was
not limited to Dr. Wandel.  Even if it were established that Dr.
Sarreck bears responsibility for surgical decision-making, there
is nothing in the record to challenge the necessity of surgery
to treat Gonzalez' high intraocular pressure, nor is there any
evidence that the procedure was considered high-risk or
contraindicated.  Accordingly, the claims of deliberate
indifference as to Dr. Sarreck and Dr. Byrnes are also
dismissed.


**Additional Claims Are Inappropriate**


In his opposition papers, Gonzalez has asserted new
allegations against Dr. Sarreck and Dr. Wright.  See Pl.'s Opp.
Mem. at 1-2.  Gonzalez, in his most recent submission to the
Court, also makes new allegations against Dr. Wandel.  See
Gonzalez Decl. ¶ 4.  He asserts that Dr. Wright is liable in his
official capacity for promulgating the DOCS' policy which gives
facility health directors the authority to control inmate

51

treatment by specialists.  Id. at 2, 20.  Gonzalez also claims
that Dr. Sarreck is "vicariously liable" for referring him to
Dr. Wandel for specialty treatment.  Id. at 2, 19.  Finally,
Gonzalez argues that an intern, and not Dr. Wandel, performed
the initial laser procedure on Gonzalez' eye.  Gonzalez Decl. ¶
4, 5.  These allegations, made for the first time in Gonzalez'
opposition, are dismissed.  See Weir v. City of New York, No. 05
Civ. 9268(DFE), 2008 WL 3363129, at *9 (S.D.N.Y. Aug. 11, 2008)
("'It is axiomatic that the complaint cannot be amended by the
briefs in opposition to a motion to dismiss.'") (quoting O'Brien
v. Nat. Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y.
1989)); see also Islam v. Goord, No. 05 Civ. 7502(RJH), 2006 WL
2819651, at *1 n.2 (S.D.N.Y. Sept. 29, 2006) (refusing in action
by pro se inmate to "consider allegations not made in the
complaint").

        With respect to Gonzalez' new allegations concerning
Dr. Wright, Gonzalez has offered no evidence that Dr. Wright's
establishment of any policy giving facility health services
director's authority to refer cases to specialists itself caused
any injury to Gonzalez or that there was any deliberate
indifference in promulgating such policy.  Additionally,
Gonzalez' claim that Dr. Sarreck should be held "vicariously
liable" for Dr. Wandel's treatment is invalid.  Gonzalez cannot

establish liability under a vicarious liability theory in a
claim under 42 U.S.C. § 1983.  See Leonhard v. United States,
633 F.2d 599, 620-21 (2d Cir. 1980) (holding that public
officials may be held liable only to the extent that they caused
a plaintiff's rights to be violated and cannot be held liable
for violations committed by their subordinates or predecessors
in office).  Although Gonzalez now claims that an intern, and
not Dr. Wandel, performed his initial procedure thereby
establishing deliberate indifference, Gonzalez has failed to
establish Dr. Wandel to have acted with the "culpable state of
mind" necessary to establish an Eighth Amendment violation.  See
Seiter, 501 U.S. at 297; Hathaway, 37 F.3d at 66.  As described
above, negligence or mere allegations of malpractice do not
state a valid Eighth Amendment claim, Estelle, 429 U.S. at 106 &
n.14, and "disagreements over medications, diagnostic
techniques, forms of treatment, or the need for specialists or
the timing of their intervention" are insufficient under § 1983.
Woods, 2002 WL 31296325, at *6.  Accordingly, the new
allegations Gonzalez raises in his opposition papers are
rejected.


**Defendants' Protection Under The Eleventh Amendment And**
**Qualified Immunity**

In support of their motions for summary judgment, both
the DOCS Defendants and Dr. Wandel contend that some form of
immunity protects them against Gonzalez' lawsuit.  See DOCS
Defs.' Mem. at 18-20; Wandel Mem. at 11-16.  The DOCS Defendants
contend that 42 U.S.C. § 1983 does not abrogate a state's
sovereign immunity and that there has been no waiver for such
claims by the State of New York.  See Quern v. Jordan, 440 U.S.
332, 338, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); Verley v.
Wright, No. 02 Civ. 1182(PKC), 2007 WL 2822199, at *8 (S.D.N.Y.
Sept. 27, 2007).  The DOCS Defendants note that Eleventh
Amendment sovereign immunity extends to damages actions against
state officials sued in their official capacities, see Kentucky
v. Graham, 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114
(1985), and that Gonzalez's monetary damages claims, to the
extent that they have been brought against the DOCS Defendants
in their official capacities, are barred by the Eleventh
Amendment.  See Graham, 473 U.S. at 169; Davis v. New York, 316
F.3d 93, 101 (2d Cir. 2002) (barring money damage official-
capacity claims against DOCS employees).

In addition to the Eleventh Amendment argument,
Defendants also argue that qualified immunity shields officials
from liability for damages when their conduct does not violate
clearly established statutory or constitutional rights, of which

a reasonable person should have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Alston v. Howard, 925 F. Supp. 1034, 1041 (S.D.N.Y. 1996). "[P]ublic officials . . . are protected by qualified immunity from civil liability for actions taken in their official capacity, if those actions were objectively reasonable in light of clearly established rules then extant." Morris-Hayes v. Bd. of Educ. Chester Union Free Sch. Dist, 423 F.3d 153, 158 (2d Cir. 2005). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Pabon, 459 F.3d at 254. The right must be recognized by either the United States Supreme Court or the relevant Court of Appeals. Id. at 255. Here, Defendants reason that, since the right to medical information prior to undergoing medical care was first recognized as a Fourteenth Amendment right by the Pabon Court in 2006, Plaintiff's Fourteenth Amendment claim against those Defendants acting in their official capacity must be denied.

Gonzalez, in response to the DOCS Defendants' Eleventh Amendment argument states that Dr. Wright is the only individual sued in his official capacity, see Pl.'s Mem. at 20, and that

the Eleventh Amendment does not afford Dr. Wright protection.
Pl.'s Mem. at 21. Gonzalez' response to Defendants' claim of
qualified immunity argues that New York State statutes and
administrative regulations passed in the 1970s established
Gonzalez' right to informed consent. Citing this Court's
decision in Clarkson v. Coughlin, 898 F. Supp. 1019, 1039
(S.D.N.Y. 1995), for the proposition that a prisoner claiming
due process violations under the Fourteenth Amendment can sue to
enforce rights arising out of the United States Constitution,
state statutes or administrative regulations, Gonzalez cites New
York Public Health Law § 2803-c and 10 N.Y.C.R.R. §
405.7(a)(7)(iii) as one statute and one regulation, both of
which were in effect prior to Gonzalez' surgeries, affording him
a protected liberty. This argument, however, is undermined by
the Second Circuit's ruling in Pabon, which discussed Clarkson
(as well as cases from the Third and Ninth Circuits) and
concluded that this line of jurisprudence had not clearly
established the right to medical information in the Second
Circuit. See Pabon, 459 F.3d at 255 ("We do not agree with
Pabon that White, Benson, and Clarkson render this right to
medical information clearly established.").

Because of other abovementioned reasons to dismiss
Gonzalez' claims, the issue of whether Defendants were protected

56

by the Eleventh Amendment or qualified immunity is moot and no

judgment is made concerning the applicability of these defenses.


**Conclusion**


        For the foregoing reasons, Defendants' motions for

summary judgment are granted.


**New York, NY**
**October** _J 4,_ **2011**

                    ROBERT W. SWEET
                       U.S.D.J.

57